**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| H.G., an individual;<br><br>Plaintiff<br><br>-against-<br><br>INTER-CONTINENTAL HOTELS CORPORATION;<br><br>MARRIOTT INTERNATIONAL, INC.,<br><br><br>Defendants. | CIVIL ACTION NO :<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW the Plaintiff H.G., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2. Inter-Continental Hotels Corporation (hereinafter "IHG") and Marriott

1

International, Inc. (hereinafter "Marriott") knew and should have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, IHG and Marriott have instead chosen to ignore the open and obvious presence of sex trafficking at their hotels, enjoying the profit from rooms rented for this explicit and apparent purpose.

3. This action for damages is brought by the Plaintiff (hereinafter identified by her initials "H.G."), a survivor of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4. H.G. was first trafficked for commercial sex at the age of 17 years old after being kidnapped by a stranger. As a young child, H.G. had been removed from her childhood home after brutal and systematic sexual abuse by her father. She was living in an orphanage when her apparent vulnerability was first targeted by her traffickers, who then used brute strength to regularly abduct her from her school or work and drive her to the Defendants' hotels where she was forced to endure brutal physical assaults, psychological torment, verbal abuse, and imprisonment at the Defendants' hotels. H.G.'s traffickers would then release her to return back to her daily life with the constant fear of never knowing when their next abduction would take place. This continued for years as the Defendants did nothing but profit.

5.   The Plaintiff now brings this action for damages against the Defendants listed herein.   Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.   H.G. was kept against her will, physically tortured, and sexually exploited under such duress at hotels in Detroit and Ann Arbor, Michigan including the Holiday Inn® Express and Suites – Detroit Downtown and the Fairfield Inn®, by Marriott – Ann Arbor.

7.   As a direct and proximate result of Defendants' consistent refusals to prevent human trafficking at their respective hotels, H.G. was sex trafficked, sexually exploited, and victimized repeatedly at both the Holiday Inn® Express and Suites – Detroit Downtown and the Fairfield Inn®, by Marriott – Ann Arbor.

8.   The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. § 1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from the trafficking venture in which she was trafficked for the purpose of commercial sex, systematically exploited, and brutally victimized in violation of 18 U.S.C. § 1591 (a).

## PARTIES

9.   The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified

---

[1] Contemporaneously with the Complaint, Plaintiff A.C. filed a Motion for

3

by her initials H.G., was seventeen (17) years old when she was first sold for sex and trafficked throughout eastern Michigan for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. § 7102 (15) and 18 U.S.C. § 1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C § 7102 (14).   The Plaintiff currently resides in Solano County, California.

10.   Defendant Inter-Continental Hotels Corporation ("IHG") is one of the largest hotel brands in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its regional headquarters in Atlanta, Georgia and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

a.   Holiday Inn® brand hotels are IHG hotels.

b.   As a hotel operator, Defendant IHG controls the training and policies for its hotels including the Holiday Inn® where H.G. was trafficked. Defendant IHG represents that it considers guest safety and security important and requires all of the hotels in its portfolio to comply with

---

Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

IHG brand standards and all local, state, and federal laws.[2]

c.  Through its relationship with the staff at the Holiday Inn® where H.G. was trafficked and the hotel guest perpetrator who trafficked H.G. at Holiday Inn® hotels, Defendant IHG knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

d.  IHG receives a percentage of the gross room revenue from the money generated by the operations of Holiday Inn® hotels, including a percentage of the rate charged on the rooms in which the Plaintiff was sex trafficked.

e.  IHG owns, supervises, and/or operates the Holiday Inn® Express and Suites – Detroit Downtown located at 1020 Washington Boulevard in Detroit, Michigan.

f.  IHG is subject to the jurisdiction of this Court because it regularly transacts business in the state of Michigan, operates dozens of hotels

---

[2] *See* IHG Human Rights Policy, Sep. 18, 2019, *available at* www.ihgplc.com/-/media/ihg/files/pdf/policies/policies-2019/en_ihg_human_rights_policy_september_2019.pdf?la=en&hash=B42BBB96 10597BB5FFDBC8A5788AAA71 (last visited Dec. 7, 2019). *See also* Inter-Continental Hotels Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019)

in the state of Michigan, contracts to supply services in the state of Michigan, caused indivisible injuries to the Plaintiff in the state of Michigan, and knowingly profited from an illegal sex trafficking venture at the Holiday Inn® Express and Suites – Detroit Downtown located at 1020 Washington Boulevard in Detroit, Michigan.

11.  Defendant Marriott International, Inc. (hereinafter "Marriott) is one of the largest hotel brands in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its headquarters located at 10400 Fernwood Road in Bethesda, Maryland.

      a.  Fairfield Inn® brand hotels are Marriott hotels.

      b.  As a hotel operator, Defendant Marriott controls the training and policies for its hotels including the Fairfield Inn® hotel where H.G. was trafficked.

      c.  Defendant Marriott maintains that it considers guest safety and security to be important and requires all of the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[3]

---

[3] *See* Marriott Human Rights Policy, *available at* www.marriott.com/Multimedia/PDF/Corporate/HumanRights.pdf, and Marriot Human Rights Policy Statement, July 2017, *available at* www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf.

d. Through its relationship with the staff at the Fairfield Inn® where H.G. was trafficked and the hotel guest perpetrator who trafficked H.G. at Fairfield Inn® hotels, Defendant Marriott knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known to engage in sex trafficking.

e. Marriott receives a percentage of the gross room revenue from the money generated by the operations of Fairfield Inn® hotels, including a percentage of the rate charged on the hotel rooms in which the Plaintiff was trafficked.

f. Marriott owns, supervises, and/or operates the Fairfield Inn® by Marriott – Ann Arbor located at 3285 Boardwalk in Ann Arbor, Michigan.

g. Marriott is subject to the jurisdiction of this Court because it regularly transacts business in the state of Michigan, operates dozens of hotels in the state of Michigan, contracts to supply services in the state of Michigan, caused indivisible injuries to the Plaintiff in the state of Michigan, and knowingly profited from an illegal sex trafficking venture at the Fairfield Inn® – Ann Arbor located at 3285 Boardwalk in Ann Arbor, Michigan.

12. Whenever reference is made in this Complaint to any act, deed, and/or conduct of the Defendants, the allegation is that the Defendants engaged in the act(s), deed(s), and/or conduct by or through one or more of their officers, directors, agents, employees, and/or representatives who was/were actively engaged in the management, direction, control, and/or transaction(s) of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

13. This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. The an amount in controversy that exceeds $75,000.)

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

15. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the

means, and the purpose.

16. To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it is best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. §§ 1589 and 1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. § 1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. § 1589.

17. Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

18. Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work *and* the 'Johns' or 'buyers' who obtain, solicit, and/or patronize forced commercial sex work.[4]

---

[4] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the

## FACTUAL ALLEGATIONS

## A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project[5]*

19. Human trafficking is the world's fastest growing crime.[6] While the term "human trafficking" incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[7]

20. Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

---

purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.

[5] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[6] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[7] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

21.     The hospitality industry plays a crucial role in the sex trade.[8]  The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

22.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[9]  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

23.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

24.     Hotels are also the venue of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased

---

[8] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[9] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

involvement of hotels.   In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[10]

25.     The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[11]

26.      Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[12]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

27.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.   Thus, the hospitality industry has the greatest reach to prevent, identify, and thwart sexual exploitation where it is most likely to occur.

28.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from dangers that were known or should

---

[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[11] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[12] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

have been known, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[13]

29.	Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal, not to mention moral, obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[14]

30.	From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

---

[13] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[14] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at:
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

31.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[15]

32.      Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[16] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

33.     Hospitality companies can and should mandate that *all* staff working at *all*

---

[15] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[16] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

hotel properties across their brand complete sex trafficking training.[17]

34.   In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

35.   The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

36.   In 2011, Wyndham trained only some of its employees to look for signs of trafficking.[18]

37.   In 2012, an anti-trafficking coalition alerted Choice Hotels of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[19]

38.   Marriott International claims it amended its Human Rights Policy as early

---

[17] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[18] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[19] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [20]

39.   In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[21]

40.   In 2015 and 2016 IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (I) risks of modern slavery affecting their organization including IHG hotels, (ii) risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle.  IHG represents that its various

[20] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

[21] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019).

risk assessment mechanisms have helped them to identify higher risk locations since 2013.[22]

41. Choice Hotels has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[23]

42. Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[24] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[25]

---

[22] *Id.*

[23] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).

[24] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[25] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

43.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B.  THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

44.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

45.     The average consumer does not see this relationship.  The parent brand gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

46.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases,

the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[26]

47. The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

48. Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

49. At the time of the incidents alleged herein:

    a. Defendant IHG owned and controlled the Holiday Inn$_®$ brand.
    b. Defendant Marriott owned and controlled the Fairfield Inn$_®$ brand.

50. Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments so it is seldom done.

## C. THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

---

[26] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

51.   Defendants IHG and Marriott have been on notice of repeated incidences of sex trafficking occurring at their Holiday Inn®, and Fairfield Inn® hotels yet these brand managers failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

52.   INTER-CONTINENTAL HOTEL CORPORATION, INC. ("IHG"):

    a.   HOLIDAY INN®

        i.   Defendant IHG owns, supervises, and/or operates the Holiday Inn® Express and Suites – Detroit Downtown located at 1020 Washington Boulevard in Detroit, Michigan.

        ii.   IHG failed to implement and enforce any of its own policy or policies and protect Plaintiff H.G. from being sex trafficked.

        iii.   IHG knew or should have known that the Holiday Inn® hotel where Plaintiff H.G. was trafficked was in an area known, or should have been known, for high incidence of crime and prone to sex trafficking activity on and around the hotel premises.[27]

        iv.   Despite having actual or constructive knowledge of the

---

[27] *See* "Michigan's reported human trafficking cases increased in 2017," 3/14/2018, https://www.wxyz.com/news/michigans-reported-human-trafficking-cases-increased-in-2017 (accessed 12/9/2019). *See also* https://humantraffickinghotline.org/state/michigan

extensive prostitution and sex trafficking that occurs at its hotels, Defendant IHG has repeatedly failed to stop these actions.

v. Defendant IHG may exercise control over Holiday Inn® hotels by:

1. distributing information to assist employees in identifying human trafficking;

2. providing a process for escalating human trafficking concerns within the organization;

3. requiring employees to attend training related to human trafficking;

4. providing new hire orientation on human rights and corporate responsibility;

5. providing training and education to Holiday Inn® hotels through webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking; or

7. providing checklists, escalation protocols and information to property management staff; or tracking performance

indicators and key metrics on human trafficking prevention.

vi. Defendant IHG is/was in an agency relationship with Holiday Inn® hotels offering public lodging services in the hotel. This agency relationship was created through Defendant IHG exercise of an ongoing and systemic right of control over Holiday Inn® hotels by Defendant IHG's operations, including the means and methods of how Holiday Inn® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant IHG's domain;

2. requiring Holiday Inn® hotels to use Defendant IHG's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

22

10. regular inspection of the facility and operation by owner;

11. fixing prices; and/or

12. other actions that deprive Holiday Inn® hotels of independence in business operations.

vii. An actual and/or apparent agency also exists between Defendant IHG and Holiday Inn® hotels. Defendant IHG held out Holiday Inn® hotels to the public as possessing authority to act on its behalf.

viii. Given Defendant IHG's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and/or directing its branded hotels, including Holiday Inn® hotels, Defendant IHG breached its duties in the following ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human

23

trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

ix. For years, Defendant IHG has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Holiday Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Holiday Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff H.G. at Holiday Inn® hotels that forms the basis of this complaint.

24

1. In September 2018, a bloods gang member used threats and violence to force women into prostitution. He was arrested at the Holiday Inn® in Plainview, New York.[28]

2. In October 2017, a man was arrested for trafficking minors at a Holiday Inn® in Knoxville, Tennessee. During the police sting, the authorities found a minor the man had harbored in his car that was reported missing in Asheville, North Carolina.[29]

3. In December 2017, a man forced a woman to take drugs, burned her skin and forced her to sell herself for sex. The victim met the man at a Holiday Inn® in Bethlehem, Pennsylvania for a date, but soon became his slave.[30]

4. In August 2018, three people were arrested at a Holiday Inn® in Tyler, Texas for trafficking a woman and forcing her to engage in sex with multiple johns who responded

[28] *Police Say Bloods Member Arrested for Sex Trafficking*, AP NEWS (Sept. 1, 2018), https://www.apnews.com/ab1302acec7c47d49196917f7e73d6e6.

[29] *Missing NC Teen Found During Human Trafficking String Operation*, WSPA (Oct. 13, 2017), https://www.wspa.com/news/missing-nc-teen-found-during-human-trafficking-sting-operation/1009065813.

[30] Rudy Miller, *Lehigh Valley Police Uncover Nationwide Sex Trafficking Ring*, LEHIGH VALLEY LIVE (Dec. 1, 2017), https://www.lehighvalleylive.com/bethlehem/2017/12/local_police_uncover_natio nwid.html.

to her backpage.com advertisement.[31]

5. In October 2018, a couple trafficked a woman out of a Holiday Inn® in Minot, North Dakota. She was forced to service 3-5 clients a day, at $120-$220 a person, in order to pay for the pair's hotel rooms and methamphetamines.[32]

6. In November 2018, a man lured a missing woman into his hotel room where he posted advertisements of her on classified websites to engage in sex. Police retrieved text messages between the pimp and victim where the victim mentioned being at the Holiday Inn® in the Bronx, New York.[33]

53. MARRIOTT INTERNATIONAL, INC. ("MARRIOTT")

a. FAIRFIELD INN®

---

[31] *2 Arrested, 1 More Implicated in Smith County Human Trafficking Case*, EAST ESSEX MATTERS (Aug. 28, 2018), https://www.easttexasmatters.com/news/local-news/2-arrested-1-more-implicated-in-smith-county-human-trafficking-case/1402220169.

[32] Andrea Johnson, *Andrea Beck, Richard Spain Charged With Human Trafficking*, MINOT DAILY NEWS (Oct. 11, 2018), http://www.minotdailynews.com/news/local-news/2018/10/andrea-beck-richard-spain-charged-with-human-trafficking/.

[33] M. L. Nestel, *Alleged 'Pimp' Who Forced Women Into Prostitution, Including Missing Pennsylvania Teenager, Charged*, NEWSWEEK (Nov. 2, 2018), https://www.newsweek.com/corinna-slusser-missing-pennsylvania-ishi-woney-fbi-nypd-new-jersey-1198253.

26

i. Defendant Marriott owns, supervises, and/or operates the Fairfield Inn® – Ann Arbor located at 3285 Boardwalk in Ann Arbor, Michigan.

ii. Marriott Hotels failed to implement and enforce any of its own policy or policies and protect Plaintiff H.G. from being sex trafficked.

iii. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has repeatedly failed to stop these actions.

iv. Defendant Marriott may exercise control over Fairfield Inn® hotels by:

1. distributing information to assist employees in identifying human trafficking;

2. providing a process for escalating human trafficking concerns within the organization;

3. requiring employees to attend training related to human trafficking;

4. providing new hire orientation on human rights and corporate responsibility;

27

5. providing training and education to Fairfield Inn® hotels through webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking; or

7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

v. Marriott was in an actual or apparent agency relationship with Fairfield Inn$_®$ hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Marriott's exercise of an ongoing and systemic right of control over Fairfield Inn$_®$ hotels by Defendant Marriott's operations, including the means and methods of how Fairfield Inn$_®$ hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant Marriott's domain;

28

2. requiring Fairfield Inn® hotels to use Defendant Marriott's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Fairfield Inn® hotels of independence in business operations.

vi. An actual and/or apparent agency also exists between Defendant Marriott and Fairfield Inn® hotels. Defendant Marriott held out Fairfield Inn® hotels to the public as possessing authority to act on its behalf.

vii. Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating,

29

implementing, and directing its hotels, including Fairfield Inn®

hotels, Defendant Marriott breached its duties in the following

ways:

1. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

2. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

3. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

4. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

5. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; or

30

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

viii. For years, Defendant Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Fairfield Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Fairfield Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff H.G. at Fairfield Inn® hotels that forms the basis of this complaint.

1. In February 2017, a woman was sentenced to one count of conspiracy to commit sex trafficking after kidnapping a 17-year-old girl from Topeka, Kansas to Junction City, Kansas in March of 2015 for the purpose of sex trafficking. The woman forced the young girl to go to an out call with her to a Fairfield Inn in Manhattan, Kansas. [34]

---

[34] "Woman sentenced in teen sex trafficking case," KAKE ABC (2/4/2017),

2. In October 2013, a man was sentenced to five to seven years in state prison for kidnapping two underage girls and forcibly trafficking them in hotel rooms throughout Quincy, Dedham, Dorchester, and Danvers Massachusetts, including the Fairfield Inn in Dedham. [35]

3. In December 2019, an Arkansas man was arrested at a Fairfield Inn & Suites in Springdale, Arkansas after trafficking a woman across Arkansas, Louisiana, and Texas for the purpose of commercial sex. [36]

4. In November 2015, a reviewer described the Fairfield Inn & Suites Inn in Washington D.C. as follows, "The clientele was seedy. When my family and I left for dinner and returned I felt like we walked back into a Brothel. It appeared that a pimp was dropping off one of

---

http://www.kake.com/story/34426420/woman-sentenced-in-teen-sex-trafficking-case

[35] Chris Burrell, "Dorchester man arrested in Quincy pleads guilty to child prostitution charges," WICKEDLOCAL.COM, (10/23/2013) https://www.wickedlocal.com/x919096222/Dorchester-man-arrested-in-Quincy-pleads-guilty-to-child-prostitution-charges

[36] "North Little Rock man arrested in connection with sex trafficking, police say," NORTHWEST ARKANSAS DEMOCRAT-GAZETTE (12/4/2019) https://www.arkansasonline.com/news/2019/dec/04/north-little-rock-man-arrested-connection-sex-traf/

his hookers who was meeting a john. I was done. Between the seedy guests roaming around in this hotel and the other activity going on we all felt grossed out. Whew!!!! Just simply waking from the lobby to my room we felt like we were in a danger zone." The reviewer goes onto say, "We also went with the Fairfield because it had the Marriott name behind it." [37]

5. In July of 2018, a pimp named Lamont King was arrested by an undercover officer. The officer was investigating related prostitution activity in the area, including a Fairfield Inn on West 86th Street in Indianapolis, IN. King had yelled at the undercover officer to come over to him, where he suggested to her that she could keep $70 of every $100 she made if she came to work for him as a prostitute. He told her he would keep her safe. She told him he was under arrest.[38]

---

[37] https://www.tripadvisor.com/Hotel_Review-g28970-d939375-Reviews-or5-Fairfield_Inn_Suites_Washington_DC_New_York_Avenue-Washington_DC_District_of_Columb.html#REVIEWS

[38] "Running Blind: IMPD arrests first suspected pimp in 7 months," RTV6 Indianapolis, (7/3/2018) https://www.theindychannel.com/longform/running-blind-impd-arrests-first-suspected-pimp-in-7-months

## THE SEX TRAFFICKING OF H.G.

54.     The facts alleged herein stem from a sex trafficking ring operating in Eastern Michigan.  While victimized by her traffickers in Michigan, H.G. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels from approximately 2003-2011.

55.     In the summer of 2003, at seventeen (17) years old, H.G., a native of the Detroit, Michigan area, was introduced to her trafficker by older friends she had met on the streets following running away from the Michigan placement system.  Her trafficker would thereafter find her at school or in the community and forcibly remove her, bringing her to the Defendants' hotels against her will.

56.     Between the years of 2003-2008, client was trafficked for days at a time at the Holiday Inn® Express and Suites – Detroit Downtown located at 1020 Washington Boulevard in Detroit and the Fairfield Inn® – Ann Arbor located at 3285 Boardwalk in Ann Arbor, Michigan.

57.     H.G.'s trafficker would deliver her to the hotel and escort her straight through the front door to a room to complete in-calls and meet with buyers. H.G. entered the hotel without any baggage or personal items, only a small purse. At all times, her trafficker or one of his partners was downstairs in the lobby in public view, standing surveillance as H.G. was physically compelled to service a steady flow of buyers.

34

H.G. would be held captive at the hotel for a couple days at a time and the entire time there was a constant stream of male visitors to her room so that the foot traffic was both voluminous and obvious.

58. The rooms in which H.G. was harbored were always pre-paid for by her trafficker. While her direct contact with hotel staff was limited, they were aware that she was brought there often. H.G. also prohibited from having a phone, wallet, or any form of identification.

59. At the Holiday Inn® Express and Suites – Detroit Downtown, H.G. did request help once from the front desk as she displayed blood running down her leg and was visibly in danger and requiring medical attention, but she received no assistance and her trafficker pushed her back upstairs.

60. On multiple occasions, H.G. left the hotel premises through the front door in apparent need of medical assistance and would go directly to the hospital. Often, she would be found by her trafficker and taken back to the hotel where she would be tied up and forced to wait until her next call.

61. H.G. would be chained-up inside the Defendants' hotel rooms for a couple days coming in and out of consciousness. On multiple occasions, she would wake up with the evidence and pain that she had been raped, but no memory of what happened.

62. H.G's trafficker was violent, verbally abusive, and repeatedly raped H.G.

while they were at the Fairfield Inn® and Holiday Inn®.

63. H.G.'s trafficker required her to sexually service enough buyers to satisfy his daily quota. If H.G. came up short of her trafficker's quota she was subject to brutal violence.

64. At the Holiday Inn® Express and Suites – Detroit Downtown, H.G. was penetrated vaginally with a broken glass bottle. H.G. screamed in pain and bled profusely. The volume of H.G.'s scream was such that the other guests of the hotel would have heard her scream and that the staff was or should have been aware.

65. When H.G. did appear in the common areas of the hotel, she appeared malnourished and withdrawn. She was also consistently dressed in skimpy clothes that was always ripped and purchasing condoms at the nearby convenience store.

66. There was never a phone in the hotel rooms in which H.G. was kept, there would be multiple broken objects, used condoms, and other sex paraphernalia left behind in the room. Additionally, blood was often splattered all throughout the room from H.G.'s beatings and injuries.

67. H.G's trafficker specifically chose the hotels in Detroit and Ann Arbor because they had a reputation for commercial sex and illegal activity.

68. In 2008, H.G. was sold to a trafficker in another state. Hotel staff at the Embassy Hotel in Ann Arbor, told H.G.'s new trafficker that she was not there in error. H.G. used the fortunate mishap to run away. However, H.G.'s traffickers

continued to stalk, abuse, and threaten her for the next three (3) years, including showing up to her place of work and physically pulling her out of buildings. H.G. kept trying to escape but the harassment continued until she moved to the west coast in June 2011.

69. Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

70. Had the Defendants been paying attention to the activities being conducted at their hotels and on their hotels' properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of H.G.

## E. THE DEFENDANTS FACILITATED THE TRAFFICKING OF H.G.

71. IHG and Marriott profited from the sex trafficking of H.G. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to H.G's traffickers, when they knew, or should have known, that they were using their rooms to imprison H.G., physically assault her, and subject her to repeated exploitation and sexual servitude.

37

72. IHG and Marriott knew, or should have known, that H.G. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because H.G.'s trafficker frequented the Defendants' hotels.

73. IHG and Marriott knew, or should have known, that H.G. was being trafficked because H.G. constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendants' hotels for their illegal sex trafficking venture.

74. Defendants IHG and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to H.G's trafficker in which to harbor H.G. while he was trafficking her.

75. Defendants IHG and Marriott profited from the sex trafficking of H.G. and knowingly or negligently aided H.G.'s trafficker in his criminal venture. The Defendants took no action as H.G. repeatedly visited their hotels, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment and injury while inappropriately dressed for travel.

76. Defendants IHG and Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from H.G. in which to harbor H.G. while she was being trafficked.

77. The Defendants all had the opportunity to stop H.G.'s traffickers and

offenders like them from victimizing H.G. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

78. The Defendants all financially benefited from the sex trafficking of H.G., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

79. IHG and Marriott enjoyed and continue to enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands, such as Holiday Inn®, and Fairfield Inn®.

80. IHG and Marriott financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

81. The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation at their hotels.

82. The Defendants maintained their deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Not refusing room rentals, or reporting guests to law enforcement, to maximize the number of rooms occupied and the corresponding rates,

even if the rooms rented were to sex traffickers or buyers;

    c. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

83. As a direct and proximate result of these egregious practices on the part of the Defendants, H.G. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C § 1595 ("TVPRA")

84. The Plaintiff H.G. incorporates each foregoing allegation.

85. H.G. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

86. The Defendants' acts, omissions, and/or commissions, taken separately and/or together, outlined above, constitute violations of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. § 1591 (a). At all relevant times, the Defendants breached this duty by participating in, and/or facilitating, the harboring and providing of H.G. for the purposes of commercial sex induced by force, fraud, and/or coercion, by their acts, omissions,

and/or commissions.

87. The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of H.G. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of H.G.'s injuries and damages.

88. H.G. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels in violation of 18 U.S.C. § 1591 (a).

## PRAYER FOR RELIEF

WHEREFORE based on the forgoing the Plaintiff seeks injunctive relief in the form of a judgement requiring the Defendants to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated to the Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, the Plaintiff requests that

41

a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

c. past and future lost wages and loss of earning capacity;

d. past and future emotional distress;

e. consequential and/or special damages;

f. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g. punitive damages with respect to each cause of action;

h. reasonable and recoverable attorneys' fees;

i. costs of this action; and

j. pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or

jury deems appropriate under the circumstances.

## THE PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: December 9, 2019

**RESPECTFULLY SUBMITTED,**
    **PLAINTIFF,**
    **By Her Attorneys,**

/s/ Tiffany R. Ellis_____
Tiffany R. Ellis (P81456)
WEITZ & LUXENBERG, P.C.
Fisher Building
3011 W. Grand Blvd., Suite 2150
Detroit, MI 48202
Tel: (313) 800-4170
Fax: (646) 293-7992
tellis@weitzlux.com