UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

H.G.*, an individual,

     Plaintiff,                                Case No. 19-cv-13622
                                                  Hon. Matthew F. Leitman

v.

INTER-CONTINENTAL HOTELS
CORPORATION and
MARRIOTT INTERNATIONAL, INC.

     Defendants.

_____/

### OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 19, 20) AND (2) GRANTING PLAINTIFF'S MOTION TO PROCEED UNDER A PSEUDONYM (ECF No. 2)

In this action, Plaintiff H.G. alleges that she was the victim of sex trafficking at two hotels in Michigan: the Holiday Inn Express and Suites – Downtown Detroit (the "Holiday Inn") and the Fairfield Inn, by Marriott – Ann Arbor (the "Fairfield Inn"). She pleads facts suggesting that staff at these hotels knew or should have known that she was being sex trafficked, that they could have acted to prevent or interfere with the trafficking, and that they failed to do so. But she has not sued the owners of the hotels or the staff members who worked at the hotels. Instead, she has sued the franchisors who granted franchises to the owners of the hotels: Defendants Inter-Continental Hotels Corporation ("IHC") and Marriott International, Inc. ("Marriott"). She brings claims against Defendants under the federal William

Wilberforce Trafficking Victim Protection Reauthorization Act of 2008 (the "TVPRA") and under Michigan law for negligence.

Defendants have now moved to dismiss H.G.'s claims. (*See* Mots. to Dismiss, ECF Nos. 19, 20.)  The allegations that H.G. makes are deeply disturbing, and the Court feels horribly about what she apparently had to endure.   But the Court nonetheless must conclude that her claims fail as a matter of law.  Her allegations do not satisfy the state-of-mind element of her TVPRA claims, and her negligence claims are barred by Michigan's three-year statute of limitations.   The Court therefore **GRANTS** Defendants' motions to dismiss and dismisses H.G.'s claims with prejudice.

# I

## A

H.G. is a native of the Detroit, Michigan area.[1] (*See* Am. Compl. at ¶89, ECF No. 15, PageID.218.)  In the summer of 2003, when H.G. was 17 years old, she was introduced to a sex trafficker. (*See id.*)  That trafficker "would thereafter find her at school or in the community and forcibly remove her, bringing her to [the Fairfield Inn and the Holiday Inn] against her will." (*Id.*) At these hotels, "from approximately 2003-2011," H.G. was "subject[ed] to repeated instances of rape, physical abuse,

---

[1] For purposes of the pending motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts as true the allegations in H.G.'s First Amended Complaint.

verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment." (*Id.* at ¶88, PageID.217-218.)

H.G.'s trafficker and his associates did not try to hide their sexual exploitation of H.G. from the staff at the Holiday Inn and the Fairfield Inn.  On the contrary, "at all times" that H.G. was "kept" at the hotels, "her trafficker or one of his partners was stationed downstairs in the lobby in public view, standing surveillance as H.G. repeatedly serviced buyers of commercial sex." (*Id.* at ¶¶ 93, 104, PageID.218-220.) Likewise, "H.G.'s trafficker forcefully delivered her to the hotel[s] and escorted her straight through the hotel[s'] front door[s] directly passed [sic] the front desk[s] to [] room[s] that he had previously rented. This display occurred numerous times and H.G. was often visibly impaired by drugs." (*Id.* at ¶¶ 91, 101, PageID.218, 220.)  In addition, on "[t]he days [that] H.G. was kept at [Defendants' hotels] there was a constant stream of male visitors to her room[s] straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious." (*Id.* at ¶¶ 94, 103 PageID.219, 220.)   Finally, "there would be multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms. Additionally, blood was often splattered all throughout the rooms from H.G.'s beatings and injuries." (*Id.* at ¶114, PageID.222.)

At one point, H.G. even "requested help … from the front desk [at the Holiday Inn] as she displayed blood running down her leg." (*Id.* at ¶106,

PageID.221.)   On that occasion, even though "H.G. was visibly in danger and requir[ed] immediate medical attention, [] she received no assistance and her trafficker pushed her back upstairs." (*Id.*)  At other times, "H.G. left the Fairfield Inn [] through the front door and past the staffed front desk in apparent need of medical assistance and would go directly to the hospital." (*Id.* at ¶96, PageID.219.)

"H.G. kept trying to escape [her traffickers] but the harassment continued until she moved to the west coast in June 2011." (*Id.* at ¶117, PageID.223.)  In 2017, H.G. "was medically treated for what was long term effects of repeated physical trauma" suffered as a result of her "being trafficked for commercial sex" at the Holiday Inn and Fairfield Inn. (*Id.* at ¶120, PageID.223.)

**B**

The Holiday Inn and the Fairfield Inn are owned and operated by entities or individuals who are not parties to this civil action. (*See id.* at ¶74, PageID.200.) Those owner/operators are franchisees of Defendants. (*See id.*)

H.G. insists that even though Defendants neither own nor operate Holiday Inn and Fairfield Inn directly, they "exercise [] an ongoing and systemic right of control" over those hotels. (*Id.*)   According to H.G., Defendants assert this control by directing "the means and methods of how [the hotels] conduct[] daily business through one or more of the following actions":

1. hosting online bookings on Defendant[s'] domain;
2. requiring [the hotels] to use Defendant[s'] customer rewards program;
3. setting employee wages;
4. making employment decisions;
5. advertising for employment;
6. sharing profits;
7. standardized training methods for employees;
8. building and maintaining the facility in a manner specified by the owner;
9. standardized or strict rules of operation;
10. regular inspection of the facility and operation by owner;
11. fixing prices; and/or
12. other actions that deprive [the hotels] of independence in business operations.

(*Id.* at ¶86(a)(vi), PageID.205-206; *see also id.* at ¶87(a)(v), PageID.212-213.)

Moreover, the hotels pay "around 10% of their total revenue back to [Defendants] and [are] required to develop and maintain [their] propert[ies] in accordance with [Defendants'] brand standards as they are laid out in franchise agreement[s]." (*Id.* at ¶77-78, PageID.201.)   Defendants enforce these "standards through periodic inspections and even termination of the [franchise] agreement[s] … if the [hotels are] found to be inadequate." (*Id.* at ¶¶ 79-80, ECF No. 201-202.)

## C

H.G. contends that Defendants "knew or should have known that sex trafficking in hotels was industry wide, includ[ing] at its hotels, and that a significant portion of all sex trafficking was taking place at [their] hotels." (*Id.* at ¶41, PageID.192.)  She says that "between at least 2003 and 2011, each Defendant held

meetings among its executives, directors and managers at which sex trafficking in hotels was discussed." (*Id.* at ¶29, PageID.190.)  And "during at least the 2003 to 2011 time period, emails were exchanged by employees of each Defendant that related to sex trafficking in hotels including Defendants' hotels." (*Id.* at ¶30, PageID.190.)  Finally, "from 2003 until 2011, each Defendant received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its hotels." (*Id.* at ¶50, PageID.194.)

## II

H.G. filed her initial Complaint on December 9, 2019. (*See* Compl., ECF No. 1.)  She brought two counts against each Defendant. Counts I and II alleged that Defendants were negligent under Michigan law. Counts III and IV alleged that Defendants violated the TVPRA. (*See id.*)

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). (*See* Mots., ECF Nos. 10, 11.)  They argued that H.G.'s TVPRA claims failed on the merits as a matter of law because, among other things:

- She did not plausibly allege that Defendants participated in a sex trafficking venture involving her. (*See*, *e.g.*, IHC Mot. to Dismiss, ECF No. 10, PageID.109.);

- Her "allegations concerning purported trafficking at other [hotels under Defendants' brands did] not sufficiently show that [Defendants], the

purported franchisor[s], had knowledge of <u>this</u> alleged sex trafficking." (*Id.*, PageID.118; emphasis in original.);

- She failed to "allege any facts that 'should have alerted' [Defendants] (as opposed to, perhaps, the franchisee hotel owner or hotel operator) to [her] trafficking." (*Id.*); and

- To the extent she was seeking to hold Defendants vicariously liable for the acts and/or omissions of their franchisees, she did not "plead facts sufficient to allege that [Defendants], as [] purported franchisor[s], or as [] alleged principal[s] in an agency relationship with the franchisee[s], [were] liable for the alleged acts of the franchisee hotel owner[s]." (ECF No. 10, PageID.119.).

In the alternative, Defendants argued that H.G.'s TVPRA and negligence claims were barred by the applicable statutes of limitations. (*See id.*, PageID.109.)

On February 11, 2020, the Court entered an order granting H.G. leave to file a First Amended Complaint. (*See* Order, ECF No. 13.)  In that order, the Court highlighted Defendants' arguments that H.G.'s claims were barred by the statutes of limitations and that H.G. had "failed to plead sufficient facts to support the essential elements of her TVPRA claim and to hold Defendants liable for the alleged trafficking." (*Id.*, PageID.166.)  The Court then granted H.G. "the opportunity to file a First Amended Complaint in order to remedy the purported pleading defects that

Defendants have raised in their motions to dismiss." (*Id.*)  The Court also told H.G. that this was her opportunity to add any and all factual allegations that could support her claims:

> The Court does not anticipate allowing H.G. another opportunity to amend to add factual allegations that she could now include in her First Amended Complaint. Simply put, this is H.G.'s opportunity to allege any and all additional facts, currently known to her, that may cure the alleged pleading deficiencies in the Complaint and that could support the essential elements of her claim.

(*Id.*)

H.G. filed a First Amended Complaint on March 10, 2020. (*See* Am. Comp., ECF No. 15.)  In that amended pleading, H.G. re-alleged her negligence and TVPRA claims, and she added some additional factual allegations to support those claims. (*See id.*)  Defendants again moved to dismiss under Rule 12(b)(6). (*See* Mots., ECF Nos. 19, 20.)  And they again argued that H.G. had failed to sufficiently allege that (1) they participated in a sex trafficking venture involving H.G., (2) they knew or should have known of sex trafficking by the venture that trafficked H.G., and/or (3) they controlled the actions of their franchisees such that they could be held vicariously liable for the franchisees' acts and omissions.  Defendants also again argued that H.G.'s TVPRA and negligence claims were time barred.

The Court held hearings on the motions to dismiss on August 12, 2020, and August 27, 2020.

### III

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id.* When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### IV

### A

The Court begins with H.G.'s claims under the TVPRA. Congress first enacted the Trafficking Victims Protection Act in 2000. *See* Pub. L. No. 106–386,

114 Stat. 1464 (2000). "[T]he original Act did not contain a private right of action." *Griffin v. Alamo*, 2016 WL 7391046, at *2 (W.D. Ark. Dec. 21, 2016). But in 2003, Congress amended and reauthorized the Act through the TVPRA. The TVPRA "established a civil remedy for victims of various forms of trafficking violations." *Id.* (citing Pub. L. No. 108-193, 117 Stat. 2875 (2003)). Congress amended and reauthorized the Act again on December 23, 2008. In that amendment, "Congress expanded the TVPRA's civil remedy provision, 18 U.S.C. § 1595, to allow trafficking victims to recover damages and reasonable attorneys' fees from perpetrators and established a 'financial beneficiary prong' which allows victims to recover similar relief from those who knowingly benefit, financially or otherwise, from a violation of the TVPRA." *Id.* As amended, the TVPRA now provides that:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (**or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter**) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

18 U.S.C. § 1595(a) (emphasis added). It is the "financial beneficiary prong" of the TVPRA (in bold above) under which H.G. attempts to recover from Defendants in this action.

10

**B**

A claim under the "financial beneficiary prong" of the TVPRA has three elements: (1) that the defendant "knowingly benefit[ted]," (2) "from participation in a venture," (3) "which [the defendant] knew or should have known has engaged" in sex trafficking. 18 U.S.C. § 1595(a). A plaintiff may satisfy these elements in one of two ways. She may show that the defendant's own acts, omissions, and state of mind establish each element. Alternatively, she may impute to the defendant the acts, omissions, and state of mind of an agent of the defendant. The former is referred to as "direct liability" and the latter as "indirect liability." *See*, *e.g.*, *A.B. v. Hilton Worldwide Holdings, Inc.*, 2020 WL 5371459, at *6 (D. Ore. Sept. 8, 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020).

Here, H.G. attempts to establish both direct and indirect liability. Defendants argue that she has failed to plausibly allege either theory. The Court agrees.[2]

---

[2] At several points in this Opinion and Order, the Court discusses the allegations made against, and the defenses raised by, Defendants jointly. The Court does so for the sake of brevity and clarity and because H.G. has raised substantially similar allegations against both Defendants. The Court acknowledges that IHC and Marriott are "unrelated companies and that [H.G.] must separately allege facts against each [D]efendant to support her claims." *Wyndham Hotels*, 2020 WL 4368214, at *4.

**1**

H.G.'s direct liability claim fails because she has not sufficiently alleged the third element of that claim – the element that focuses on Defendants' knowledge of alleged sex trafficking.[3]  To satisfy that element, a plaintiff must plead facts showing that the defendant knew or should have known of sex trafficking *by the particular venture in which the defendant allegedly participated*.   Indeed, the plain language of the financial beneficiary prong clearly links the required knowledge to the venture in which the defendant purportedly participated.  As noted above, that prong makes a defendant liable for knowingly benefitting "from participation in a venture which [he] knew or should have known has engaged" in sex trafficking. 18 U.S.C. § 1595(a).  The "knew or should have known" language appears in the "which" clause, and that clause is focused directly on the "venture" in which the defendant "participat[ed]."  Accordingly, the relevant state-of-mind inquiry for purposes of the third element focuses on whether the defendant knew or should have known of sex trafficking by the venture in which he allegedly participated.  It thus follows that a defendant's "knowledge or willful blindness of a general sex trafficking problem … does not satisfy the *mens rea* requirements" of a claim under the financial beneficiary

---

[3] Because the Court concludes that H.G. has failed to plausibly allege the third element of her TVPRA claims, the Court does not reach the question of whether she has sufficiently alleged the other two elements.

prong. *S.J. v. Choice Hotels International, Inc.*, --- F.Supp.3d ---, 2020 WL 4059569, at *5 (E.D.N.Y. July 20, 2020).

H.G.'s state-of-mind allegations fall short because she has not plausibly alleged that Defendants knew or should have known of sex trafficking by the ventures in which they allegedly participated.  She contends that Defendants participated in the ventures that trafficked her for sex (*see*, *e.g.*, First Am. Compl. at ¶¶ 16, ECF No. 16, 121-122, 129-130, 153, 158, PageID.183, 223-224, 225, 229, 231), but she has not identified specific facts, known to these Defendants, that would have or should have put them on notice of any unlawful activity – much less sex trafficking – by those particular ventures.  Instead, she highlights numerous facts that should have alerted Defendants' *franchisees* to sex trafficking by the venture. (*See*, *e.g.*, First Am. Compl. at ¶¶ 91-114, PageID.218-222.)  But the franchisees' alleged knowledge does not support H.G.'s *direct* liability theory because that theory depends upon Defendants' *own* states of mind. *See Wyndham Hotels*, 2020 WL 4368214 at *6 (holding that plaintiff could not rest direct liability claim against hotel franchisors upon allegations "that the staff at the franchisee hotels where Plaintiff was trafficked knew or should have known about her trafficking"); *Hilton Worldwide*, 2020 WL 5371459 at ** 8-9 (dismissing direct liability claim against hotel franchisors that rested upon facts allegedly known by the staff at the franchisee-owned "hotel where Plaintiff was trafficked"); *Choice Hotels*, 2020 WL 4059569 at

** 4-5 (dismissing direct liability claim against hotel franchisor that rested upon "dramatic examples of sex trafficking" that were apparent to "staff" at franchisee-owned hotels).[4]

H.G. also attempts to establish the third element of her claim by pleading that Defendants "knew or should have known that trafficking was taking place from at least 2003 – 2011" at the Holiday Inn and Fairfield Inn (where she was allegedly trafficked). (*Id.* at ¶¶ 33-34, PageID.191.)   However, these allegations are insufficient to establish the state-of-mind element of her claim for two reasons.  First, they are conclusory and are not supported by specific factual allegations that, if proven, would establish Defendants actually knew or should have known of the trafficking at these two hotels.   Second, these allegations do not show that Defendants knew or should have known of sex trafficking *by the particular venture in which they allegedly participated*.  That Defendants knew or should have known about trafficking by other (or unspecified) ventures in which they are not alleged to have participated is not enough under the financial benefit prong of the TVPRA.

In her next attempt to establish that IHC acted with the requisite state of mind, H.G. highlights that the Holiday Inn is located in an area "known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises."

---

[4] Moreover (and in any event), for the reasons explained below (see Section IV(C), *infra*), H.G. has failed to allege a plausible basis for imputing the franchisees' knowledge to Defendants.

(First Am. Compl. at ¶86(iii), ECF No. 15, PageID.203). But this allegation still says nothing about whether IHC knew or should have known of sex trafficking *by the particular venture in which it allegedly participated*.[5]

Finally, H.G. maintains that Defendants had the requisite state of mind because they knew that sex trafficking was occurring in at least some hotels operating under their brand names and was occurring more broadly in the hotel industry. (*See, e.g. id.* at ¶¶ 35-42, 66-71, PageID.190-192, 199-200.) But, again, these allegations that Defendants were generally aware of sex trafficking in the hotel industry and at some properties operating under their brand names fall short of establishing that Defendants knew or should have known of sex trafficking *by the ventures in which they purportedly participated*.

For all of these reasons, H.G.'s state-of-mind allegations are insufficient, and her direct liability theory fails as a matter of law.

### 2

H.G. counters that her state-of-mind allegations are sufficient under *M.A. v. Wyhdham Hotels & Resorts, Inc.*, 425 F.Supp.3d 959 (S.D. Ohio 2019). In that case,

---

[5] In addition, a footnote to this allegation underscores its insufficiency. The footnote cites a news story from 2017 as the support for the allegation that IHC knew or should have known of the sex trafficking problem in and around the Holiday Inn. The alleged trafficking of H.G. concluded in 2011. (*See* First Am.Compl. at ¶ 88, ECF No. 15, PageID.217-218.) Thus, the article – which says nothing about the particular venture in which IHC allegedly participated – does not support any inference concerning IHC's knowledge during the relevant time frame.

a plaintiff alleged that she had been trafficked at hotels owned by franchisees of the corporate franchisor-defendants.   And, like H.G., the plaintiff alleged that the franchisors either "knew or should have known that [their] defendant hotel locations were in an area known for sex trafficking activity." *Id.* at 967.  The plaintiff further alleged that "despite knowledge of the problem of sex trafficking in its hotels," one of the corporate defendants "did not require that employees participate in training to prevent human trafficking." *Id.*  Finally, the plaintiff alleged that she "observed some of the same hotel staff over the course of the time she was trafficked for sex at the [d]efendant hotel properties," that "[a]t each of the [d]efendants' hotel properties, [she] was routinely escorted by her trafficker in view of the front desk after her trafficker paid in cash for the reserved room out of which the sex trafficking venture was housed," and "[d]espite her desperate pleas and screams for help, after being beaten or choked at the [d]efendants' hotel properties, the hotel staff ignored her and did nothing to prevent the ongoing and obvious torture she endured while she was regularly trafficked for sex at [d]efendants' hotel properties." *Id.*  The court held that, based on these allegations, the plaintiff had sufficiently pleaded the defendants' state of mind:

> The question, then, is whether Plaintiff has alleged sufficient facts at this stage to show Defendants *should have* known about the sex trafficking venture. [….] This Court finds that M.A.'s allegations are sufficient to meet the negligence standard in § 1595 for purposes of surviving a Motion to Dismiss. M.A. has alleged that

> Defendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence. She also alleges facts specific to her own sex trafficking, including a number of signs she alleges should have alerted staff to her situation. These allegations are sufficient to survive a 12(b)(6) motion to dismiss.

*Id.* (emphasis in original).

For at least two reasons, *M.A.* does not persuade the Court that H.G.'s state-of-mind allegations are sufficient.  First, there is a critical distinction between the allegations in *M.A.* and those here.  The plaintiff in *M.A.* plausibly alleged that the defendants' franchisees (*i.e.*, the individual hotel owners) were agents of the defendants. *See id.* at 971-972.  For that reason, the court imputed to the defendants the knowledge of the hotel owners and the hotel staff.  Indeed, the court expressly relied upon facts known to the hotel staff members as support for its conclusion that the plaintiff's state-of-mind allegations were sufficient. *See id.* at 967.  Here, in sharp contrast (and for the reasons stated below, *see* Section IV(C), *infra*), H.G. has not plausibly alleged that Defendants' franchisees were agents of Defendants.  Thus, unlike in *M.A.*, the knowledge of staff at the Holiday Inn and Fairfield Inn may not be imputed to Defendants.  Accordingly, one key basis on which the court in *M.A.* found the state-of-mind allegations in that case to be sufficient is missing here.

Second, the Court respectfully disagrees with the conclusion of the court in *M.A.* that a plaintiff may sufficiently plead a defendant's state of mind by alleging

that the defendant was "on notice about the prevalence of sex trafficking *generally* at [its] hotels." *Id*. at 967 (emphasis added).  For all the reasons stated above, this Court concludes that in order to state a viable TVPRA claim, a plaintiff must allege, among other things, that the defendant knew or should have known of sex trafficking by the *particular* sex-trafficking venture in which the defendant is alleged to have participated.  The Court agrees with the court in *Choice Hotels* that a defendant's "knowledge or willful blindness of a general sex trafficking problem … does not satisfy the *mens rea* requirements" of a claim under the financial beneficiary prong. *Choice Hotels,* 2020 WL 4059569, at *5.

For all of these reasons, *M.A.* does not persuade the Court that H.G.'s state-of-mind allegations are sufficient.

## C

The Court now turns to H.G.'s theory of indirect liability under the TVPRA. Under that theory, H.G. alleges that Defendants' franchisees who operated the Holiday Inn and the Fairfield Inn were agents of Defendants.  Thus, H.G. contends, the franchisees' knowledge of sex trafficking by the venture that trafficked her may be imputed to Defendants, and Defendants may be held vicariously liable for the franchisees' violations of the TVPRA.  The Court concludes that this theory fails because H.G. has not plausibly alleged that the franchisees were agents of Defendants.

Under Michigan law,[6] "the test for a principal-agent relationship is whether the principal has the right to control the agent." *Little v. Howard Johnson Co.*, 455 N.W.2d 390, 393 (Mich. App. 1990) (internal citation omitted). In the context of franchisor-franchisee relationships, "a franchisor must have the right to control the day-to-day operations of a franchisee in order to establish an agency relationship." *Id.* "It is not enough that the owner retained mere contractual control, the right to make safety inspections, or general oversight." *Id.* at 394.

H.G. has failed to plausibly allege that Defendants have "day-to-day" control over the Holiday Inn and Fairfield Inn respectively. H.G.'s primary allegations regarding Defendants' control over their franchisee hotels are located in paragraphs 86(a)(vi) and 87(a)(v) of the First Amended Complaint. As quoted above, in those paragraphs, H.G. alleges:

> Defendant IHG is/was in an agency relationship with the Holiday Inn® Express and Suites – Detroit Downtown by offering public lodging services in the hotel. This agency

---

[6] There is a split of authority with respect to whether state common law or federal common law applies to the question of whether a party can be held indirectly liable under the TVPRA based on an agency relationship. *Compare Choice Hotels*, 2020 WL 40599569, at *5 (applying "New York agency law" to resolve whether plaintiff could rely "upon an agency theory to indirectly impose liability on the franchisor defendants under the TVPRA") *with Hilton Worldwide*, 2020 WL 5371459, at *9 ("examin[ing] vicarious liability as a question of federal common law"). Here, both parties analyzed this issue under state law. The Court will therefore treat the question as one that arises under Michigan law. In any event, for all of the reasons stated above, even if the Court applied the federal common law of agency, H.G.'s agency allegations are so deficient that she would fail to plausibly state an indirect liability theory under federal common law.

19

relationship was created through Defendant IHG's exercise of an ongoing and systemic right of control over Holiday Inn® Express and Suites – Detroit Downtown by Defendant IHG's operations, including the means and methods of how Holiday Inn® hotels conducted daily business *through one or more* of the following actions:

1. hosting online bookings on Defendant[s'] domain;
2. requiring [the hotels] to use Defendant[s'] customer rewards program;
3. setting employee wages;
4. making employment decisions;
5. advertising for employment;
6. sharing profits;
7. standardized training methods for employees;
8. building and maintaining the facility in a manner specified by the owner;
9. standardized or strict rules of operation;
10. regular inspection of the facility and operation by owner;
11. fixing prices; and/or
12. other actions that deprive [the hotels] of independence in business operations.

(First Am. Compl. at ¶86(a)(vi), ECF No. 15, PageID.205-206; emphasis added. *See also id.* at ¶87(a)(v), PageID.212-213 (same allegation for Marriott).)

H.G.'s use of the modifier "one or more" strips these allegations of any force. While she lists twelve ways that Defendants *may* exercise control, she cannot say and does not say that Defendants use more than *one* of the twelve methods of control. And she cannot say and does not say *which one* of the twelve forms of control Defendants allegedly use. Thus, these allegations are far too uncertain and vague to

plausibly establish that Defendants controlled the franchisees' operations to such an extent that the franchisees were Defendants' agents.

H.G.'s other allegations with respect to control are likewise insufficient to establish that the franchisees were Defendants' agents. For instance, H.G. asserts that Defendants "exercise[] actual control over [their] franchisees through control over the brand standards which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel." (Resp. Br., ECF No. 21, PageID.342.) But "facts tending to show that the franchisors' involvement was limited to uniformity and standardization of the brand" have been found to be insufficient to establish "complete control over the day-to-day operations of the franchisee's business." *Choice Hotels*, 2020 WL 40595969, at *6. *See also Little*, 455 N.W.2d at 394 (holding that "franchise agreement [that] primarily insured the uniformity and standardization of products and services offered by a Howard Johnson restaurant" did not amount to "obligations" that "affect the control of daily operations"); *Acedo v. DMAX, Ltd.*, 2015 WL 12696176, at *29 (C.D. Cal. 2015) (applying Michigan law, holding that plaintiff had failed to allege principal-agent relationship, and explaining that "[i]n the [] franchisor-franchisee context…Michigan courts have held that a franchisor's retention of the right to set standards regarding products and services offered by the franchisee, its right to regulate furnishings and advertising used by the franchisee, and its right to inspect

to determine compliance with the terms of the franchise agreement is insufficient to establish the existence of an agency relationship"). Indeed, the Court in *Little* specifically rejected the plaintiff's argument that "an agency relationship is created where the franchisor retains the right to set standards regarding the products and services offered by the franchisee [and] the right to regulate such items as the furnishings and advertising used by the franchisee." *Little*, 455 N.W.2d at 393.

H.G. further argues that Defendants "exert[] dominion and control over its franchisees, and has control over the existence of the franchisor-franchisee relationship" because Defendants can "terminate" the franchise agreement if they are unhappy with how the franchisees are running their hotels. (Resp. Br., ECF No. 21, PageID.344.) But the court in *Little* rejected the argument that "the right to hold the franchisee in breach of [a] franchise agreement" was sufficient to establish the kind of "day-to-day" control required to establish an agency relationship under Michigan law. *Id.*

For all these reasons, H.G. has failed to sufficiently allege that Defendants' franchisees were agents of Defendants. Thus, H.G. has failed to advance a viable theory of indirect liability under the TVPRA.

Because H.G. has failed to sufficiently plead Defendants' direct or indirect liability under the financial benefit prong of the TVPRA, the Court **DISMISSES** her TVPRA claims.

## V

Even if H.G. had plausibly alleged the essential elements of her TVPRA claims against Defendants, the bulk of those claims would still fail because they are barred by the applicable statute of limitations.  In addition, the claims would fail to the extent they seek to recover based upon alleged acts and omissions occurring before December 23, 2008 – the effective date on which Congress amended the TVPRA to include the financial benefit prong – because that amendment to the TVPRA does not apply retroactively.

## A

"A complaint is subject to dismissal without any further proof 'if the allegations ... show that relief is barred by the applicable statute of limitations.'" *Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).  *See also Pierce v. Oakland County*, 652 F.2d 671, 672 (6th Cir. 1981) (affirming dismissal of complaint on statute of limitations grounds where "it was apparent from the face of the complaint that the three-year statute of limitations had run").  Here, it is clear from the face of the First Amended Complaint that the statute of limitations has run on a majority of H.G.'s TVPRA claims.

The TVPRA has a ten-year statute of limitations.  It provides that "no action may be maintained under subsection (a) unless it is commenced not later than the later of . . . 10 years after the cause of action arose; or (2) 10 years after the victim

reaches 18 years of age, if the victim was a minor at the time of the alleged offense." 18 U.S.C. § 1595(c).  H.G. filed this action on December 9, 2019. (*See* Compl., ECF No. 1.)  Thus, H.G. may only pursue claims for alleged violations of the TVPRA that occurred after December 9, 2009 (ten years prior to the filing of her initial Complaint).  But the bulk of her claims relate to trafficking that took place from 2003-2008.  Thus, even if H.G. had plausibly alleged the essential elements of her TVPRA claims, the portions of those claims resting on her trafficking prior to December 9, 2009, would be time-barred.[7]

---

[7] Defendants would go further.  They insist that the entirety of H.G.'s TVPRA claims are time barred.  Defendants argue that "according to the Complaint, the latest date a cause of action could have accrued … was in 2008." (IHC Mot. to Dismiss, ECF No. 20, PageID.302.)  And they highlight that in paragraph 90 of the First Amended Complaint, H.G. alleges that she was trafficked "[b]etween the years 2003-2008." (First Am. Compl. at ¶90, ECF No. 15, PageID.218.)  Defendants insist that because H.G. did not file her initial complaint until 2019 – more than 10 years after she says that her trafficking ended in 2008 – no portion of H.G.'s TVPRA claims are timely filed.  Defendants' reading of the First Amended Complaint is not unreasonable. Indeed, under one reading of H.G.'s allegations, she was trafficked at the Holiday Inn and Fairfield Inn until 2008, ran away from her traffickers in 2009, and was not trafficked at either hotel after that time.  However, that is not the only plausible reading of her allegations.  And H.G. specifically alleges that she was trafficked at the Holiday Inn and the Fairfield Inn until at least 2011. (*See id.* at ¶88, PageID. 217-218.)  At this stage of the proceedings, the Court will accept that allegation as true. Thus, if H.G. had sufficiently pleaded her TVPRA claims, a limited portion of those claims would have been timely.

**B**

H.G. would have also been barred from pursuing damages for the bulk of the alleged trafficking because that trafficking occurred before the adoption of the financial benefit prong of the TVPRA, and that prong does not apply retroactively.

The "presumption" that a statute is not retroactive "is deeply rooted in our jurisprudence." *Landraf v. USI Film Products*, 511 U.S. 244, 265 (1994). Thus, courts have "declined to give [a statute] retroactive effect … unless Congress had made clear its intent" that the statute should be retroactive. *Id.* at 270.

Congress gave no indication that the financial benefit prong of the TVPRA applies retroactively. As explained above, Congress amended the TVPRA to add the financial benefit prong on December 23, 2008. The amendment says nothing about liability for actions that occurred prior to its enactment. For that reason, several courts have held that the amendment is not retroactive and does not create liability for actions prior to December 23, 2008. *See*, *e.g.*, *Griffin*, 2016 WL 7391046, at *4 ("the Court finds that the financial beneficiary prong of § 1595(a), as amended, should not be applied retroactively"); *St. Louis v. Perlirtz*, 2016 WL 1408076, at * (D. Conn. Apr. 8, 2016) ("Because the amended version of § 1595 has the effect of increasing defendants' liability for past conduct, it cannot be applied retroactively in the absence of a clear statement from Congress, which the statute

lacks").  This Court likewise concludes that the financial benefit prong of the TVPRA does not apply retroactively to acts and omissions before its adoption.

H.G. counters that she could pursue a claim under the financial benefit prong based upon acts and omissions occurring before its enactment because she "had unexpired negligence claims against [Defendants] at the time [the amendment was] enacted." (Resp. to Mot. to Dismiss, ECF No. 22, PageID.425.)  But whether H.G. had unexpired state-law negligence claims says nothing about whether the financial benefit prong of the federal TVPRA applies retroactively.

For these reasons, the Court concludes that if H.G. had pleaded the essential elements of her TVPRA claims, she nonetheless would have been barred from recovering damages from Defendants for any alleged wrongdoing that occurred at the Holiday Inn or Fairfield Inn prior to the December 23, 2008, amendment of the TVPRA.

## VI

The Court next turns to H.G.'s negligence claims under Michigan law.  Those claims are barred by the statute of limitations.

As H.G. acknowledges, under Michigan law, "a claim for ordinary negligence must be brought within three years after a person is injured." (H.G. Resp. Br., ECF No. 21, PageID.346, citing Mich. Comp. Laws § 600.5805.)  As described above, H.G. claims that her trafficking ended, at the latest, in 2011.  (First Am. Compl. at

¶88, ECF No. 15, PageID.217-218).   Thus, H.G. had to file her negligence claims under Michigan law by no later than 2014.   She did not.   She filed this action in 2019.   Her negligence claims were filed too late.

H.G. counters that her negligence claims are timely because those claims "arose" when she "learned of the long-term effects of her trafficking in 2017." (*Id.*, PageID.347.)   But H.G does not allege that she first discovered the long-term effects of her trafficking until 2017.[8]   Nor does she cite any case law or other authority for the proposition that even if she first discovered the long-term effects of her trafficking in 2017, that late discovery would toll Michigan's statute of limitations.[9]   Simply put, H.G. has not provided the Court any basis upon which to conclude that her negligence claims are timely.   The Court will therefore **DISMISS** those claims.

---

[8] In paragraph 120 of the First Amended Complaint, H.G. says that she was "*treated* for what was long term effects of repeated physical trauma" in 2017. (*See* First Am. Compl. at ¶120, ECF No.15, PageID.223; emphasis added.)   But nowhere in the First Amended Complaint does H.G. allege when she first learned about or discovered her injuries.

[9] It is possible that some sort of discovery rule could apply to H.G.'s negligence claim.   But it is not the Court's job to discover the authority supporting such a rule and to develop a discovery-rule theory for H.G. *See, e.g., Rayyan v. Sharpe*, 2008 WL 4601427, at *7 (W.D. Mich. Oct. 15, 2008) (citing cases and noting that "[i]t is not the court's job to conduct research, marshal evidence, or make a party's arguments for him").

## VII

H.G. has not filed a formal motion for leave to file a Second Amended Complaint, but she did request leave to amend during the hearing on the instant motions. The Court declines to permit H.G. to amend for a second time.

While leave to amend should be "freely give[n] when justice so requires," Fed. R. Civ. Proc. 15(a)(2) (emphasis added), justice does not require that H.G. be permitted to file a Second Amended Complaint.  As described in great detail above, the Court has already granted H.G. a full and fair opportunity to address and cure *the very same pleading defects* that the Court addressed in this Opinion and Order. Under these circumstances, leave to amend yet again – to correct faults that were specifically highlighted for H.G. prior to her last amendment – is properly denied.

Justice would not be served by granting H.G. another "do over" after the parties and the Court have spent substantial time litigating the second round of motions to dismiss.  Indeed, the Court held several hours of hearings, over two days, on Defendants' motions to dismiss.  Defendants each had multiple lawyers appear at those hearings.  And the Court also had to spend considerable time reviewing nearly 150-pages of briefs and a growing (and ever evolving) body of case law both prior to and after the hearings.  Leave to amend is not justified under these circumstances.

28

Finally, H.G. is not "entitled to an advisory opinion from the Court informing [her] of the deficiencies of [her] complaint and then [yet another] opportunity to cure those deficiencies." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) (quoting and affirming district court order denying leave to amend complaint).

At the hearings on Defendants motions to dismiss, counsel for H.G. said that H.G.'s trauma-related memory impairments justify leave to amend again.  Counsel explained that H.G.'s memories of her trafficking have been coming back slowly and sporadically and that H.G.'s lack of complete memory explains her failure to include more detailed allegations in her original Complaint and First Amended Complaint.  However, H.G. has failed to show how her impaired memory relates to the basis of the Court's ruling here.  As explained in detail above, the Court has found insufficient H.G.'s allegations regarding (1) *Defendants*' knowledge of the particular sex trafficking venture at issue here and (2) the relationship between Defendant franchisors and their franchisees.  H.G. has not explained how her repressed and impaired memories of her day-to-day victimization inhibited her from making allegations on these matters – that do not relate directly to her daily experiences.  Moreover, counsel for H.G. did not identify any facts that H.G. has recalled since filing her First Amended Complaint that now enable her to file a Second Amended Complaint that cures the defects identified by the Court.  In short,

counsel's general reference to H.G.'s impaired memory does not warrant an additional amendment.

In an appeal from one of this Court's prior decisions, *Wysong Corp. v. APN, Inc.*, 266 F. Supp. 3d 1058 (E.D. Mich. 2017), the Sixth Circuit confirmed that denying leave to amend under the circumstances here is a proper exercise of discretion under Rule 15.  In *Wysong*, the defendants moved to dismiss the plaintiff's complaint, and, as in this case, the Court gave the plaintiff an opportunity to amend in order to correct the pleading deficiencies identified in the motion. The plaintiff filed an amended complaint, but it did not cure a key defect that the defendants had identified in the motion to dismiss.  This Court held that the defect was fatal to plaintiff's claims, and the Court denied leave to amend a second time because the plaintiff had failed to cure the defect when directly given the opportunity to do so. On appeal, the Sixth Circuit held that this Court's "reasons were sufficient to justify denial of leave to amend," and that court affirmed the denial of leave to amend. *Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 273 (6th Cir. 2018). As in *Wysong*, even though Rule 15 embodies a liberal policy in favor of permitting amendments, *see, e.g., Tucker v. Middleburg-Legacy Place, 539 F.3d 545, 552* (6th Cir. 2008), the Court declines to grant H.G. leave to file a Second Amended Complaint.

## VIII

Finally, the Court addresses H.G.'s request to proceed in this action through use of a pseudonym. (*See* Mot., ECF No. 2.)  "As a general matter, a complaint must state the names of all parties. Fed.R.Civ.P. 10(a). However, [courts] may excuse plaintiffs from identifying themselves in certain circumstances." *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004).   "Several considerations determine whether a plaintiff's privacy interests substantially outweigh the presumption of open judicial proceedings. They include: (1) whether the plaintiffs seeking anonymity are suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiffs to disclose information 'of the utmost intimacy'; (3) whether the litigation compels plaintiffs to disclose an intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiffs are children." *Id.*

Courts in cases that involve victims of sex traffickers routinely allow plaintiffs, at least at the early stages of the litigation, to proceed under a pseudonym due to the sensitive and intimate nature of their allegations. *See*, *e.g.*, *Wyndham Hotels*, 2020 WL 4368214, at *10 (explaining in detail why it is appropriate to plaintiff alleging that she was the victim of sex trafficking to use a pseudonym).  For all the same reasons explained in *Wyndham Hotels*, and because, given the Court's ruling above, the interests of H.G. remaining anonymous outweighs any prejudice

31

to Defendants or the public, the Court will allow H.G. to proceed under a pseudonym at this time.

**IX**

For all the reasons stated above, **IT IS HEREBY ORDERED** that:

- Defendants' motions to dismiss (ECF Nos. 19, 20) are **GRANTED**;

- H.G.'s First Amended Complaint (ECF No. 15) is **DISMISSED WITH PREJUDICE** and **WITHOUT LEAVE TO AMEND**; and

- H.G.'s motion to proceed under a pseudonym (ECF No. 2) is **GRANTED**.


s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  September 23, 2020            UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 23, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764